Dish Network Corporation v. NLRB Good morning, Your Honors, and may it please the Court, Eric Chomsky representing Dish Network. Your Honors, this appeal comes down to three fundamental principles of agency law which resolve this appeal in our favor. First, an agency can only be affirmed on the same basis that the agency itself articulated. Second, an agency cannot engage in bare speculation. And third, agencies cannot depart from their own precedents without explaining why they're doing so, and they cannot override a court's interpretation of a statute. Now, taking those in order, the Board found that there was no impasse for a single narrow reason, that the union's December 2018 counterproposal was, quote, a white flag. That therefore is the only basis on which the Board could be affirmed. But there is no evidence, none, that the union was going to surrender, that it was going to wholesale abandon QPC. On the contrary, the only evidence shows that the union valued QPC above everything else in the negotiations. The only evidence the Board relied on was a mistake. The ALJ asserted that attrition rates purportedly as high as 116% meant that the employees being paid under QPC soon would be a minority and that the union therefore would abandon QPC. But the 116% figure comes from a different dish location that isn't even at issue here, and there is no evidence whatsoever, nothing in the record, that the union was going to abandon QPC in future negotiations. On the contrary, the union's lead negotiator, Sylvia Ramos, candidly testified that she never gives up dues provisions, arbitration-related issues, just to keep the status quo, just to keep QPC. There is literally no evidence to support the ALJ's speculation about this. JUSTICE SCALIA. Your no evidence statement concerns me some. There is the offer on the table and the last offer from the union to — I mean, you've already addressed it indirectly by your figure, referring to the 160% — that we would give up having it apply to future hires. That could at least be seen in the Board's view as the first crack in the door to deal with this overly generous contractual arrangement that just came up with a few years earlier. Why isn't that in itself a sign of continuing possibilities of negotiation, that they finally have put on the table that we will not insist for all time, for all employees, on this super-generous arrangement? MR. WESTMORELAND. Let me answer the question two ways, Judge Southwick, both legally and factually. Sure, it was movement, but the Board itself has been clear for more than half a century that the mere fact of movement isn't enough. The key thing that matters — and this is a direct quote from the Hayward Dodge case that the other side relies so heavily on — there has to be a real potentiality, not for movement, for agreement. And that's why I so heavily emphasize the question whether the union was going to surrender. Dish had made absolutely clear, and everyone agrees that Dish was not going to accept QPC. The testimony on that is uncontroverted, and the record is absolutely clear on that, and the General Counsel indeed says that in their response brief. The fact that the union had moved some doesn't tell us that they were going to surrender on QPC, and that's why I started where I did. And unless they were going to, there was not going to be an agreement about this. Now, that was a hard-line position that Dish took, but that's absolutely permissible. The standard or the discussion that the courts have engaged in — and this is this court's own decision in Chevron Oil, 442F, seconded 1072 — adamant insistence on a bargaining position is not in itself a refusal to bargain in good faith, and Dish's position was QPC had to go. So Judge Southwick, to answer your question, I'm sure perhaps it was a crack in the door, but if anything, it was a crack that showed that there wasn't going to be an agreement. Dish had made clear this was its final proposal. That is the language in black and white at 1326 in the record. It says final proposal at the top of the page. This was handed over during the bargaining, and it says company rejects continuation of QPC. Having received that final proposal, what does the union do? It comes back and continues to propose a form of QPC. At that point, Dish says, all right, we're done here, and in the December 18th letter, it says, we believe the prospects for bargaining have been exhausted, and that made perfect sense under the circumstances. I do want to circle back around and focus just a bit more on what the ALJ said here, and it's critical to note that there are kind of two components of what the ALJ said that are so wrong. First of all, there's the factual assertion that the union's proposal made it probable that new hires receiving non-QPC rates would soon become the majority, and the ALJ says that twice, both at 2172 to 73, excuse me, at 2172, and then again in note 16 on 2176, and that's just factually inaccurate. Under the very statistics that the ALJ himself relied on, QPC was going to remain in place for years, but even if you conceded the premise, which is not supported by substantial evidence, there is nothing to support the idea that if the number of employees on QPC dropped below a majority, the union was going to abandon QPC, and on the contrary, every indication in the record here is that the union was going to hang on to it. I alluded previously to the testimony from Ms. Ramos that's at 543 to 545, and again at 599, and the union's own negotiator, Bolanek, emphasizes this at 1019. This was sort of an extraordinary negotiation. Ordinarily what happens is a union is trying to get something better. Here, everyone agreed that the union was just trying to hang on to the status quo. The only thing they wanted was to keep QPC, and the reason they wanted that was exactly the one, Judge Southwick, that you alluded to before. This test had failed. Salaries had gone through the roof to the point that people working on the line didn't even want to go into management because they would have had to take a pay cut to get it, and so all of the evidence here indicates that the union was just hanging on to QPC, and there was no indication to support the ALJ's conclusion that it was going to abandon it. Suppose we agreed with you that there was an impasse in December of 14. What is the relevance of the year? I mean, the whole — the union's entire thing that they're asking for is to keep the status quo. Dish gave them the status quo after effectively declaring the impasse, say, by hypothesis in December of 14 for a whole year while Bolanek was sort of coming up to speed or handling his trial or whatever was going on. What do we do with that year of status quo maintenance in the middle? Does that affect the impasse declaration? I'd say a couple things about it, Judge Oldham. First of all, to the extent that the agency addressed that at all, the board thought that the length of time that passed weighed in favor of concluding that there was an impasse, right? The language is even considering the length of time, you know, we don't think that there's an impasse. And so if anything, I think it's in favor of concluding it. The other way to look at it is, candidly, that it just doesn't matter, that once you have this impasse, the fact that there's passage of time is neither here nor there. And again, it's nothing that the board relied on other than an R-direction. The one other point that I would make on the impasse point before shifting over to the Hobson's choice constructive discharge is just to remind the Court that the board completely failed to address the ALJ's mistake concerning the statistics. The Supreme Court's been absolutely clear in Motor Vehicle Manufacturers Association and there are a variety of other cases that an agency has an obligation to address significant problems that are presented to it. In our exceptions, we argued to the board, the ALJ just made this math error here or looked at the wrong numbers, depending on how you want to look at it, and the board either said nothing about it, in which case there's a basic agency law problem under Motor Vehicle Manufacturers Association, or it incorporated it by reference where it quotes the ALJ and relies on it. And so there's sort of a damned if you do, damned if you don't problem there for the board's decision. I do want to shift over, if there are no further questions on that, to the constructive discharge point. This is, in all honesty, a pretty strange kind of a case. I think it's really important to situate ourselves in the legal framework here. The constructive discharge idea is the same one that you see in other contexts. It's a discrimination claim. And so the standard type of a constructive discharge, which the board declined to address, looks a lot like a discrimination claim. So when Haberman in this court said, the employer's conduct, and these are the two elements of the test, the employer's conduct created working conditions so intolerable that an employee is forced to resign, and the employer acted essentially with malintent. That is the thing that the Hobson's choice theory, and that has different elements. The elements of that are that the employer must require the employees to make a choice, this is the Hobson's choice, to choose between union activity and continued employment, and moreover, the union rights being surrendered must be so fundamental, and this is the language of not just lively electric but a whole series of federal court decisions, so fundamental that giving them up is, quote, inherently destructive of the union. Now, there was no choice here. And you can see that by comparing this to cases in which Hobson's choices are found. The most common version of it is when an employer goes open shop or simply goes nonunion and says, we're not recognizing the union anymore. And that's what you see in a variety of the cases that the other side has relied on. Under the circumstances, of course there's a choice. If you're going to show up to work, you literally are giving up your right to be represented by the union. Now, there was nothing like that here, and that's why this Court in Electric Machinery said that the kind of rule that the general counsel is advancing here, quote, would approach eliminating the requirement of proving anti-union animus entirely. That's 653 F. 2nd at 965. And you can see that's exactly what's going on here from the argument that the general counsel makes in their response brief at 16. What do they say that the choice was? That the supposed choice that was before the employees was, quote, working in an atmosphere of diminished collective bargaining rights. That's pretty similar to what the ALJ said at 2178, continuing to work under greatly diminished conditions. Now, if that's the standard for a Hobson's Choice constructive discharge, then literally every single unfair labor practice, every single impasse would give rise to a constructive discharge under a Hobson's Choice theory. Because you would always be going to work under this so-called atmosphere of diminished collective bargaining rights, and so you would always be able to bring this claim. And what the Board said in Lively Electric, and what this Court said in Electric Machinery, is that that is absolutely wrong as a matter of policy. What you should do under circumstances like these is what the 17 employees who didn't leave did. That is to say, you file a grievance, assuming the employer doesn't give in, you follow it through, and if you win, then you're going to get reinstatement and back pay. But what it isn't is a Hobson's Choice that gives you a separate cause of action that you've been discriminated against under 8A3. If there are no questions about that, I reserve the balance of time for rebuttal. Thank you, sir. Thank you. Good morning, and may it please the Court. My name is David Casserly. I'm representing the National Labor Relations Board. This case and the Board's findings in this case are not so simple and so cabined as opposing counsel has made them out to seem. The Board relied on several considerations in finding impasse here. Its white flag analysis incorporated two aspects of the judge's decision. One was the judge's decision that the union had stated that it would be willing to agree to future concessions, possibly because this was its first major concession on QPC. And second, the judge's analysis of the attrition rates and the idea that after several years, the union would have fewer of its members under — operating under a QPC. And therefore, this accomplished most of what Dish was looking for. What is the relevance of the fact that there would be — suppose the attrition rate was 116 percent. I assume you would agree with me that 116 is irrelevant, right? 116 is clearly irrelevant, because that's not the right office. Yes, Your Honor. That's not. And the judge quoted the 30 percent numbers and the 14 and 22 percent in his analysis. Okay. So let's go with the 30 percent. Okay. Suppose that year over year, in many years from now, there's going to be a majority of the employees, of the technicians in the relevant office who aren't getting QPC. Why does that matter if Dish's final proposal is zero? We don't care about a majority not getting it. Our preposition is zero. Well, Your Honor, here the judge's analysis was based on his view that after three years or so, which is the length of the contract at issue here, unions are democratic organizations. If most of their members are not under QPC, there's not going to be any will for the unit left for fighting to keep a relatively small minority of the members to keep receiving QPC in future contract negotiations. And while three years may sound like a long time, keep in mind the bargaining here had already lasted for four years under which employees were under QPC. Dish waited another year and was clearly willing to wait another year before implementing. So three years is actually not, you know, if Dish had accepted, if the union had given this offer at the outset of negotiations and Dish had accepted it, practically no employees now today in 2019 would be under QPC. When did the union change its position between we hate QPC to we love QPC? What was the year or date? 2013, Your Honor. And so the different, do you remember roughly what time in 2013? Yes. The union's first proposal was in the end of May or June 2013. Got it. So there's 18 months between that and December of 2014 when, so there's 18 months of a disagreement over whether we should have QPC at these two offices that Dish operates in North Texas. Yes. Even at the attrition rates that would have been proper, which again are not what the ALJ said, but just assume that we can ignore that the ALJ made a mistake. Even then, it's twice as long as the union had been defending the QPC benefit. Yes, Your Honor. That would have been twice as long since then as the union had been defending QPC. And did the, in the ALJ, neither the ALJ nor the board ever discussed that, right? Well, the ALJ talked about the length of contract when he was speculating about the effect of the union's proposal in the future. So the ALJ says high attrition. Yes. So that's obviously a relative term, high to what, doesn't actually specify. Right. It says high attrition, but doesn't make a similar comparison between the amount of time that the union had enjoyed QPC, so I'm just talking about the 18 months from May of 2013 to December of 2014, and the amount of time that it would take to have this critical mass turnover. No, Your Honor. The ALJ didn't make any particular calculations as in that way, no. And doesn't substantial evidence require that? I mean, the way I read Justice Frankfurter's opinion in universal camera, you can't just say, is there some evidence that there could have, would have, should have maybe in the future been some kind of democratic change in the union and its voting. You also have to compare that to the evidence in Dish's favor, and we have to find it substantial one way or the other, right? No, Your Honor. It's, the reason why is that what the ALJ is looking at here is not what definitely would happen from the union's proposal. What the ALJ is looking at is whether the sides looking at this would see this as significant enough of a concession to warrant further meetings. Keep in mind, Dish refused to even meet after this point. So the ALJ's point here is not, okay, this definitely would have given Dish everything it would have wanted in a short amount of time. The point is, there's enough of that possibility opening up, and the judge's talk about attrition rates is towards that end. So here, if Dish had those concerns that you had, if Dish came to the union and said at the bargaining table, look, I realize this is the only motion you've ever made on QPC, at least in the past 18 months, since you first proposed it. This is a, you know, we realize you think this may be a big deal, but here, look at our current attrition rates. We just don't want to be paying this to employees for another year and a half, another 18 months. We, you know, we might be open to something if you could find something that'll end QPC quicker than that, or end it for the majority of the unit much quicker than that, but Dish didn't do any of that. It didn't bring any of these concerns to the union's attention. It just said, we're not going to meet with you anymore. Is there a case that says that a private company can't just say no? Like, if the company's position is zero, I mean, that's obviously not in bad faith if they, for four years, are in a negotiation with the union, right? Maybe if they start at zero and they refuse to engage in any kind of negotiation. But I've read through your brief. I've read through the cases. I'm trying to, I can't find a case that says that if you have proposed for four years of negotiation, at the end of the four years, you say, my position is zero. And then the counter response is, well, how about something more than zero? That the company can't just say, okay, well, I guess we haven't agreed to zero. Well, Your Honor, so first of all, no, there's no case that's directly on point with the four years of zero. I mean, that's a pretty specific fact and circumstance. But the board did cite two cases, Twin City Concrete and Fountain Lodge, for the proposition that if a party makes a counter proposal that has significant motion, it's not sufficient to just say no without even meeting. And so that's what the board relied on here. That there's no meeting, there's no discussion. And I'm also gonna push back a little bit on the idea that for four years, there's been no on one side and there's been, or even for 18 months, there's been no on one side and there's been yes on the other side. The record here is clear that Dish's problem with QPC was not the idea of having an incentive payment or something like that. The problem with QPC was how much it cost. And every time they talked about it, they were saying this is costing us too much. There was no reason for the union to think that if there was some way to get the cost structure the same, that then Dish would not be okay with that. The same cost but distributed differently or something along those lines. So the idea that it's zero on one side and yes on the other ignores that the wage rates are all related here. Mr. Schumpke said earlier that it's undisputed, and I thought that was true, that it's undisputed that Dish's position has always been no Q, well, since the switch in position, right? So there were 18 months between the summer of 2013 and December of 2014 that just no QPC. Dish was, that's true, Your Honor, but that's in the context of the proposals as they were going back and forth. And Dish's reason for explaining why no QPC was it cost us too much. So when you, and when you look at these bargaining proposals, the unions proposing straight wages that under QPC would cost more than Dish was paying to non-union employees, but keep in mind when the union proposed pie, for instance, so it had proposed a straight wage and proposed pie incentives, and this is in May of 2013. Dish's response to that was no, we don't want any kind of incentive payment at all, because that would alter our cost structure of the contract as we have given it. And we want to maintain the cost structure. So they're not, their issue here is not with the system, it's with the amount of money. And so I realize that is mostly an issue with QPC because it is a lot of money, but the idea is it's sort of not bargaining with zero on one side and QPC on the other side. It's bargaining with a level of wages that is very high on one side and lower on the other side and moving slightly to meet, but not moving totally to meet. I'm going to move on to the board's finding of bad faith, which again, this is another basis for the board's decision. It's not, the board did not solely rely on the white flag that the judge, the white flag analysis of the judge. The board also relied on Dish's bad faith. And this is clearly explained at page 2169 to 70 of the board's decision. Part of the, under board law, bad faith defeats impasse, and you cannot, because, and under this court's law, and Carrie Salt, this court, explicitly said that. So if there is bad faith in the bargaining, there cannot be an impasse because impasse assumes that the parties have bargained in good faith to reach that point. And the board relied on all of the refusals for in-person meeting to establish bad faith, particularly considering that the parties had initially planned to keep bargaining through December and Dish canceled those meetings or Dish refused to reschedule those meetings and just sent an email and did not give any reasons really for any of its, for refusing to discuss with the union after that point. So that's another basis for the board's decision. Second, the third basis for the board's decision is the board also relied on the, Dish's insistence on a ratification vote on December 18th, which Dish did not challenge on appeal. And I will mention here Dish's state in its reply brief that it, that it thinks this was not a finding of the board, but the board adopted in full the judge's findings, conclusions, and the judge's order. The judge's conclusions in law, of law, include a paragraph stating that Dish separately violated Section 885 by conditioning bargaining on a ratification vote. And the board's order, the order under review here, includes a paragraph speaking to that violation. So here the ratification vote is also another reason in the cases the judge cited behind that show that after an insistence on a ratification vote has happened, there cannot be impasse after that point unless that insistence has been repudiated. Unless there are any more questions on the impasse issue. Yes, Your Honor. There are, I'm looking at page 2170 of the board's decision. Yes. And there are several sentences in this carryover paragraph from 2169 to the effect of the Respondent summarily rejected the counterproposal, refused to have a bargaining session, summarily refused to meet and confer, made it abundantly clear it wouldn't meet and confer. Obviously, they've been meeting and conferring for four years. What I'm trying to figure out is what is the ‑‑ can you always defeat an employer's finding of impasse by simply making a counterproposal and asking for a meeting? No, Your Honor. The counterproposal has to show significant movement if that's going to happen. The board's point here is under the specific circumstances of this case. It looks like the union has made significant motion. It looks like the union is still trying to reach agreement and not being entrenched in its position. So that is central to the bad faith analysis. But we still look at the ALJs. Because the board adopts the ALJ, findings of bad conclusions law, we look at both together? Yes, Your Honor. At least the parts that were adopted by the board, yes. And I guess I'll then address the issue of the ALJ supposedly making a factual error here, which we touched on. The board here, again, adopted the findings of the ALJ, so fairly clearly adopted the ALJ's findings in that matter. If you look at the ALJ decision, the ALJ, again, does not state any specific attrition rate that he was basing his analysis on. He's not saying, I'm basing this on the 114%. He set out all of the attrition rates for all of the locations that he just took straight from DISH's, you know, from evidence the general counsel subpoenaed from DISH. He just took that and straight copied and pasted it in his facts. In his analysis, he quoted two rates for each one, the rate for 2014 and the rate for 2015, which were the two most recent ones. And I think it's only reasonable to see the judge's opinion as characterizing those attrition rates as high, not as the attrition rates at the other locations. So and even under those rates, again, in 2014, it was over 30% at both locations. That's what would have been available to the negotiators at the time in terms of attrition rates. So the board really had no error to correct. The judge simply wasn't relying on what DISH was claiming. The judge was relying on at that point. JUSTICE SCALIA. Counsel, let me ask you to articulate the court, this court's role in the particular matter I'm going to raise. It seems to me that ABLE counsel on the other side has said that DISH took the position that we're not moving any further after three or four years of good faith negotiation. It's clear we're not getting anywhere with getting rid of QPC, and that's our position. We're stopping. AOJ, ALJ, the board, you here argue there was significant movement by the next response from the union and that even though some movement is not enough, significant movement, whatever labels you want to use, is sufficient to require. It does seem to me that there's a very good argument that at some stage a company ought to be entitled under the statutes that we're looking at to just declare, if you're not going to give us this, there's no more need to negotiate. The board, ALJ less importantly, the board has held, has found here there was enough movement here to justify requiring the company to come back. I don't know if I see it that way. What is the role of this court in deciding whether that's the proper view of that evidence? It seems to me it's both a legal question of whether this was significant enough, is it actual . . . I mean, part of it comes down to the legal right of DISH to take that position and say we're not coming off it. And so there's not anything significant in the movement if they're entitled to do that. So what do we as the Fifth Circuit do with that argument? Well, Your Honor, the Fifth Circuit does, as it says in Cary Salt, defer to the board's findings both on impasse and on bad faith in terms of the board is . . . They defer. We don't give carte blanche to it. We make some sort of analysis. No, Your Honor, of course. So the board here, the court's role, I think, is in looking at whether the board made a reasonable finding here, whether or not the court agrees or disagrees with the board's finding. And here, keep in mind, the board's finding is not that DISH couldn't insist on that. The board's finding is DISH here, in the face of the movement from the union, couldn't insist on that to the point where it wouldn't even meet and discuss. That's what the board is finding here. It's not finding that . . . and the board actually makes it pretty explicit here that if the union had not made this proposal showing motion on QPC, the board indicated that it believed the parties were near impasse and would have been at impasse at that point. That's fairly clear from a reading of the board's decision. So it's not that a party can never insist for four years on saying no, zero for something. If the union had just moved its wage rates by another 30 cents lower or something along those lines, you know, we wouldn't be here. This would be a fairly clear impasse case. Even though the union had made some motion on wages, it's pretty clear that the board wasn't finding that incremental motion on wage rates enough. So again, it's a matter of degree in terms of what exactly this proposal is and whether it did anything. And I think if, you know, if DISH had insisted on zero and said, okay, we met with the union over this proposal, explained its reasons why it thought this wasn't significant motion and still insisted on zero, you know, that might be an impasse situation, but that didn't happen here. And so that's what the board is relying on. All right, counsel. Thank you. Okay. So your time is up. Yes. My time's up. I guess I will leave the other issue for co-counsel to address. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Matt Holder, counsel for Intervenor Communication Workers of America. I would like to begin by talking about the Hobson's Choice issue in this case. The Fifth Circuit has previously held that the creation of the unilateral change in working conditions does not in and of itself create a Hobson's Choice. And it went back to the case, in fact, relied on by the ALJ here, Superior-Sprinkler, an NLRB decision, where the board held that the existence of unilateral changes coupled with a statement by the employer that we wish to no longer be union created the circumstances of a Hobson's Choice. We're basically being told to work or waive your right to negotiated wage rates and other benefits by the union. In this case, there was clearly the unilateral change in the significant wage cuts. Additionally, there were statements made by agents of DISH that this was with the intent to force employees to quit. And this is the text message that periodically is referenced throughout the ALJ and the NLRB's decision. And in that text message, they state that DISH's preferred method of resolving the union situation is for these employees to quit. So therefore, you have basically a statement that this change was made with an eye towards driving these employees away, to force them to make the Hobson's Choice here. And when this Court distinguished Superior-Sprinkler in the electric machinery case in the 1980s, what they said was is that in electric machinery, there is no evidence of animus towards the employer was doing such things as leaving open the possibility of the status quo throughout the negotiations and other concessions while the bargaining was ongoing. Does this one-year lapse in negotiations on balance, does that tend to support, tend to undermine the presence of impasse? Does a one-year lapse tend to amount to pushing pause? Is it pushing stop? Is it? How would you characterize it? Well, in Gulf States manufacturing, the Court said that the passage of time can break an impasse. So assuming for the sake of argument that impasse existed as of December 31st, 2014, it had been broken by the passage of time in April of 2016 when the employer actually starts making unilateral changes. And again, it was still incumbent on DISH to come back to the table because the proposals made in December of 2014 opened the door. And the National Labor Relations Act does not guarantee an outcome to a party. It guarantees a process. That process is to bargain. And whenever there is something on the table that shows significant movement, or in Gulf States parlance, an opportunity for further negotiations need not reach to the point of an agreement, but just further discussions. Because both parties can move. You don't necessarily have to concede your point. You explain your point, and then the other party can adopt and alter its position in response to what they've learned through bargaining. And that never occurred here because DISH never met. Thank you for your time, Your Honors. I'd like to see if I can squeeze three points into five minutes. First, Judge Southbrook and Judge Oldham, I want to respond to a pair of related questions that you asked. Can a company maintain that its bottom line is zero, and can at some point a company say enough is enough? The answers are yes and yes under the law. It is absolutely clear, and I read the language from one of the cases, Your Honor, that a company can maintain a bottom line position. Section 158D itself says, I mean, the NLRA itself says, forget all the judicial gloss we're talking about here, that a party can have its position and stick to it. And the Supreme Court and American National Insurance Company said parties don't have to engage in, quote, fruitless marathon sessions. So that's the first point. Second point, Judge Oldham, I want to go back to the colloquy that you had with my friend on the other side. His language was, I think, really instructive here. He said unions are democratic. That's how we know that the union was eventually going to abandon QPC. Now, of course, the board didn't say that. The ALJ didn't say that, which gives us a pretty significant Chenery problem here. But we also know that in democracies there's special interests. And if there was some subset of the union here that was still on QPC, given that the union had spent so long pushing to maintain QPC, there is every bit as much reason to think that that would have cut in the other direction. So what we end up having here, and again, this is what my friend on the other side said, we're speculating about the effect of the union's proposal in the future. Speculating. That's exactly right. And this Court in Chevron Oil and the D.C. Circuit in cases like Erie Brush and True Serve have said speculation doesn't satisfy the obligation of reasoned decision-making. The Supreme Court has spoken really, really clearly about this in Burlington Truck Lines. It talked about the tyranny that resolves if agencies are allowed to engage in this kind of backfilling through judicial argument. Expert discretion is the lifeblood of the administrative process. But unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government can become a monster which rules with no practical limits on its discretion. That most florid language there actually comes from an opinion from Justice Black, obviously a huge proponent of the administrative state. And he understood the signal evil that happens with exactly what's being proposed  And so ultimately what the general counsel says is that you just needed to have one more meeting. One more meeting to say what was absolutely clear to everyone there as the December 18th letter said, that bargaining had been completely exhausted. The third point I want to address is the suggestion that there were some other bases for the board's holding. There was a suggestion that there was an independent conclusion about bad faith and that the ratification vote. And I think that if you look closely at the board's decision, you'll see that that's just not right. In that carryover paragraph from 2169 onto 2170, the board is not talking about bad faith generally. It's talking about the failure to negotiate. Now, that all happens after there's an impasse. And once there's an impasse, there's no further obligation to engage in bargaining. That's the whole point of the impasse doctrine is once you have it, you don't have to bargain anymore. The requests from the union that came in in a variety of letters in 21, sorry, in 2016 are legally insufficient to change that. And the D.C. Circuit spoke pretty clearly about this in Erie Brush. A vague request by one party for additional meetings, if unaccompanied by an indication of the areas in which that party foresees future concessions is insufficient to defeat an impasse where the other party has clearly announced that its position is final. That is on all fours with what we have here. Dish had announced that its position was final. And if you look at the communications from the union, they're in the record at 1456, 1409, 1447, 1452. That's all the union keeps saying. Can we meet? Can we meet? With no indication of what it would change. As to the ratification vote, I would just urge the Court to look at footnote 6 of the Board's decision. The Board doesn't actually separately rely on the supposed request for a ratification. You'll see that it is in the most sort of gentle language in that footnote to the extent that this occurred. And I'd submit that before a Federal agency can bring the power of the Federal Government to bear in an enforcement action, it has an obligation to speak a lot more clearly than that. And it is not the case that the Board wholesale adopted what the ALJ said. If you look at the first few paragraphs of the Board's decision, the Board specifically says the ALJ performed the wrong analysis. It failed to consider the taft broadcasting factors, and so the Board was doing its own analysis, not incorporating the entirety of what the ALJ said. If there are no further questions, we'd ask that you overturn the Board's determination. We thank all three of you for bringing your points of view to us, and we'll take this case under advisement on all the cases we have heard this morning. We are recessed until tomorrow morning at 9 o'clock.